UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

JUL − 5 2017

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| ANTHONY B. CAMILLO, | ) | |
| DEVON N. GOLDING, M.D., | ) | |
| REUBEN F. GOODWIN, | ) | **4:17CR297 AGF/PLC** |
| PHILLIP L. JONES, | ) | |
| DWIGHT McTIZIC, | ) | |
| NICOLE McTIZIC, | ) | |
| KAZIM A. MEO, | ) | |
| REHAN RANA, | ) | |
| ROBERT J. SOMMERFELD, and | ) | |
| AMS MEDICAL LABORATORY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**INDICTMENT**

The Grand Jury charges that:

**INTRODUCTION**

1.     At all times relevant to this indictment, defendant Anthony B. Camillo ("Camillo") was a resident of Madison County, Illinois.  Camillo has worked in medical testing laboratories for over 30 years, as a phlebotomist, laboratory supervisor, manager, director, and owner.

2.     At times relevant to this indictment, co-defendant Devon N. Golding ("Dr. Golding") was a medical doctor and operated a family practice on Hampton Avenue in St. Louis City, Missouri.  For a time, Dr. Golding also owned a medical testing laboratory located in the lower level of the same building, but the laboratory closed prior to 2009.

3.　　In or before 2009, Dr. Golding and Camillo agreed that Camillo would re-open the laboratory and Camillo would be a 50% owner.  In accord with this agreement, Allegiance Medical Services, LTD ("Allegiance") was incorporated in or about October 2009.  Camillo was an owner, director, and president of Allegiance until late 2012.

4.　　At all times relevant to this indictment, defendant Kazim Meo was a part owner of Allegiance which was an approved Medicare and Medicaid provider.

5.　　At all times relevant to this indictment, defendant Rehan Rana owned or participated in a number of businesses that provided health care services to Medicare and Medicaid patients.  Rehan Rana provided funds to Allegiance and was active in the management of Allegiance.

6.　　In March 2010, the United States Department of Health and Human Services, Office of the Inspector General ("HHS/OIG") excluded un-indicted co-conspirator Azeem Meo and his company, Ultimate Practice, from participating for five years in any capacity in Medicare and Medicaid Programs.  Azeem Meo acknowledged in the written exclusion agreement that "violation of the conditions of the exclusion may result in criminal prosecution, the imposition of civil monetary penalties and assessments, and an additional period of exclusion."

**Relevant Medicare Provisions**

7.　　The Medicare Program is a federal health benefits program for the elderly and disabled.  The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare Program.  CMS acts through fiscal agents called Medicare administrative contractors ("MACs"), which are statutory agents for CMS for Medicare Part B.

8.      The MACs are private entities that review claims and make payments to providers

for services rendered to Medicare beneficiaries.  The MACs are responsible for processing

Medicare claims arising within their assigned geographical area, including determining whether

the claim is for a covered service.  Wisconsin Physicians Service Insurance Corporation

("WPS") is the Part B MAC for Eastern Missouri and thus processed reimbursement claims

submitted by Allegiance and AMS Medical Laboratory, Inc.

9.      To receive Medicare reimbursement, providers must make appropriate application

to the MAC and execute a written provider agreement.  The provider agreement obligates the

provider to know, understand, and follow all Medicare regulations and rules.  After successful

completion of the application process, the MAC assigns the provider a unique provider number,

which is a necessary identifier for billing purposes.

10.     The Medicare provider enrollment application, Section 15, entitled "Certification

Statement," states:

> I have read and understand the Penalties for Falsifying Information, as printed in
> this application.  I understand that any deliberate omission, misrepresentation, or
> falsification of any information contained in this application or contained in any
> communication supplying information to Medicare . . .  may be punishable by
> criminal, civil, or administrative penalties . . .
>
> I agree to abide by the Medicare laws, regulations and program instructions that
> apply to this supplier.  The Medicare laws, regulations, and program instructions
> are available through the Medicare contractor.  I understand that payment of a
> claim by Medicare is conditioned upon the claim and underlying transaction
> complying with such laws, regulations, and program instructions (including, but
> not limited to, the Federal anti-kickback statute and the Stark law), and on the
> supplier's compliance with all applicable conditions of participation in Medicare.
> . . .
>
> I will not knowingly present or cause to be presented a false or fraudulent claim
> for payment by Medicare, and I will not submit claims with deliberate ignorance
> or reckless disregard of their truth or falsity.

3

11.     Medicare providers must retain clinical records for the length of time required by state law or five years from the date of discharge if there is no requirement in state law.  Missouri statutes require that physicians maintain patient records for a minimum of seven years from the date when the last professional services were rendered.  Thus, Missouri law mandates that the defendants maintain all patient records for services provided from 2010 to the present.

### Relevant Missouri Medicaid Provisions

12.     The MO HealthNet Division of the Missouri Department of Social Services administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and the federal government.  Missouri Medicaid reimburses health care providers for covered services rendered to eligible low-income Medicaid recipients.

13.     A Medicaid provider must enter into a written agreement to receive reimbursement for medical services to Medicaid recipients and must agree to abide by Medicaid regulations in rendering and billing for those services.  On or about March 28, 2013, Camillo signed an enrollment application, wherein he identified himself as the owner of AMS.

14.     A Medicaid provider must submit claims by completing a CMS-1500 form, which contains the following certification:

> [T]he services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction . . . and . . . the foregoing information is true, accurate and complete.  I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

15.     Medicaid providers must retain, for five years from the date of service, fiscal and medical records that reflect and fully document services billed to Medicaid and must furnish or make the records available for inspection or audit by the Missouri Department of Social Services

4

or its representative upon request. Failure to furnish, reveal, or retain adequate documentation

for services billed to the Medicaid Program may result in recovery of the payments for those

services not adequately documented and may result in sanctions to the provider's participation in

the Medicaid Program. This policy continues to apply in the event of the provider's

discontinuance as an actively participating Medicaid provider through the change of ownership

or any other circumstance.

## Federal Anti-Kickback Act

16.     Compliance with the Anti-Kickback Act (42 U.S.C. § 1320a-7b(b)) ("AKS") is a

condition of payment for both Medicare and Medicaid. The AKS makes it a criminal offense for

any person to knowingly and willfully solicit, offer, pay, or receive remuneration in return for

and to induce any person to refer, recommend, furnish, or arrange for the furnishing of any items,

goods and services, paid in whole or part by federally funded health care programs. Both parties

to such an arrangement may be criminally liable if one purpose of the arrangement is to obtain

remuneration for the referral of services or to induce referrals.

17.     Remuneration is broadly defined as anything of value, including money, goods,

services, or the release or forgiveness of a financial obligation that the other party would

normally have to pay. In passing the AKS, Congress intended to prohibit financial incentives

that could affect the medical judgment of health care providers and lead to the provision of

medically unnecessary goods and services.

18.     The United States Department of Health and Human Services has issued "safe

harbor" regulations that define business and payment practices ("Arrangements") that are

unlikely to result in fraud or abuse. Each safe harbor sets forth specific conditions that, if met,

assure individuals and entities involved in the Arrangement that they will not be sanctioned or

prosecuted under the AKS.  However, safe harbor protection is only afforded to those Arrangements that precisely meet all of the conditions set forth in the safe harbor.

19.     To come within the safe harbors for personal services and management contracts, the parties to the Arrangement must comply with all the following conditions:

a.      the parties must have a written agreement,

b.      the written agreement must spell out in detail the services to be provided under the Arrangement,

c.      if the services are provided on a sporadic basis (as opposed to full time), the agreement must specify the exact schedule and the precise length of time to be spent in performing the services, and the services to be performed,

d.       the agreement must specify the charges for such interval of service,

e.      the term of the agreement must be at least one year,

f.      the aggregate compensation to be paid must be set in advance, consistent with fair market value in an arm's length transaction, and must not take into account the volume or value of the referral or business otherwise generated by the parties, and

g.      the aggregate contracted services must not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

20.     As health care professionals, the defendants received information, guidance, and training on the AKS from various sources and understood the AKS prohibitions and requirements as it related to their businesses.  Thus, the defendants were aware that they could be criminally prosecuted if they violated the AKS.

## COUNT 1
## THE CONSPIRACY AND ITS OBJECTS
## 18 U.S.C. § 371

21.     Paragraphs 1 to 20 are incorporated by reference as if fully set out herein.

22.     From in or about 2009 to in or about 2012, in the Eastern District of Missouri and

elsewhere,

### ANTHONY B. CAMILLO,
### DEVON N. GOLDING, M.D.,
### REHAN RANA, and
### KAZIM A. MEO,

the defendants herein, and others known and unknown, willfully and knowingly did combine,

conspire, confederate, and agree together, and with each other, to defraud the United States and

to commit offenses against the United States, that is,

a.      to knowingly and willfully solicit, receive, offer, and pay remuneration (including

any kickback, bribe, or rebate) directly and indirectly, overtly and covertly, in

cash and in kind in return for and to induce a person to refer, recommend, furnish,

and arrange for the furnishing, ordering, purchasing, and leasing of any item and

service, paid in whole or part under a federal health care program, in violation of

42 U.S.C. §§ 1320a-7b(b)(1) and (2),

b.      to knowingly and willfully execute and attempt to execute a scheme and artifice

to defraud a health care benefit program, in connection with the delivery and

payment for health care benefits, items, and services, in violation of 18 U.S.C. §

1347(a), and

c.      to knowingly and willfully falsify, conceal, and cover up by trick, scheme, and

device a material fact and to make materially false, fraudulent and fictitious

statements and representations, and to make and use materially false writings and

7

documents, in any matter within the jurisdiction of the government of the United States, in violation of 18 U.S.C. § 1001.

## PURPOSE OF THE CONSPIRACY

23.     The purpose of the conspiracy was for the defendants and their co-conspirators:

a.     to conceal Azeem Meo's illegal involvement and participation in Allegiance;

b.     to solicit, offer, pay, and receive illegal kickbacks for referring, arranging for, and recommending that blood, urine, and other specimens be sent to Allegiance;

c.     to receive Medicare and Medicaid reimbursement for testing specimens that were obtained in exchange for illegal remunerations and for services that were up-coded and not rendered; and

d.     to receive and distribute the proceeds from the conspiracy and to benefit financially from the conspiracy.

## MANNER AND MEANS OF THE CONSPIRACY

### Azeem Meo's Illegal Participation in Allegiance

24.     It was part of the conspiracy that un-indicted co-conspirator Azeem Meo illegally participated in Allegiance, a federal health care benefit program, after his exclusion in March 2010.  As stated above, Azeem Meo was prohibited from participating in any manner in federal health care programs.  To conceal his involvement in Allegiance, Azeem Meo created a new company, Hamayshaa, Inc.  Although on paper Kazim Meo, doing business as Hamayshaa, was the majority owner of Hamayshaa,  Azeem Meo actually controlled Hamayshaa and thereby controlled Allegiance.

25.     Azeem Meo's emails reflect the breadth and depth of Azeem Meo's management and control of Allegiance.  Several of these emails are described below.

26.     In a July 22, 2011 email to Camillo and Kazim Meo, Azeem Meo stated: "Per our conversation yesterday here is the summary: I will take over the financial functions as of today. Let's get rid of X-Ray department. Lay off three people two X-ray and one from lab."

27.     In the same email, Azeem Meo gave detailed instructions concerning the organizational structure of Allegiance. He stated:

> Divide the Lab into two sections (departments): Blood Work (Lab B) [and] Drug Test (Lab D). You will be responsible for Lab B. [Kazim] will be responsible for Drug Testing Lab D. Lab B will cover all operating expenses of Lab B and D, including reagents. Profit of Lab B will be split 50/50 between [Kazim] and you . . . Lab D will not have any share any profit with you . . . We will have external billing audit by outside person.

28.     In a July 31, 2011 email to Camillo and others, Azeem Meo stated: "Attached is a report by location. Please review this report. If this report is correct than we need stop servicing these accounts ASAP. This is based on billing company system not ours. Have some one verify. Please."

29.     In another email on the same day, Azeem Meo gave directions concerning which tests Allegiance should run and the qualifications for the specimen collector. He stated: "Test all specimen as Panel 8 as you have now regardless of payer to avoid any confusion. . . . Lets designate people. There will be separate specimen collector. Qualification will be read and write and common sense."

30.     An August 13, 2012 email indicates that Azeem Meo reviewed the payments that Allegiance received for lab tests. He stated: "Please someone start looking into these why are amounts are small for two of these three claims."

31.     Azeem Meo's involvement with Allegiance and Hamayshaa is further reflected in bank documents. Allegiance bank records reflect that Azeem Meo had signatory authority on several Allegiance and Hamayshaa bank accounts. As an example, on or about September 29,

2011, Azeem Meo signed a Regions Bank signature card, on which he identified himself as the

CFO of Hamayshaa and an authorized signer on the Hamayshaa bank account. Further, Azeem

Meo used checks and wire transfers to withdraw funds from Allegiance accounts and to have the

same deposited into accounts with which he was associated.

32.     It was further part of the conspiracy that Azeem Meo set up other companies,

including Series 7 Outsourcing, LLC ("Series 7"), and caused Allegiance to enter into contracts

with the companies. In a July 31, 2011 email to Camillo, Azeem Meo stated: "I would like to

have agreement between Allegiance and Series 7 Outsourcing, LLC to sign marketing

agreement. This company will bring many accounts to you guys om commission basis." As

Azeem Meo directed, Allegiance entered into a contract with Series 7 on August 1, 2011.

### False Statements in Provider Self-Disclosure Statement

33.     HHS/OIG has a "Provider Self-Disclosure Protocol" which permits a health care

provider to voluntarily identify, disclose, and resolve instances of potential fraud involving a

federal health care program. The disclosing party must submit a written statement ("Disclosure

Statement") and must certify that the Disclosure Statement contains truthful information. The

disclosing party may not use the voluntary disclosure protocol to circumvent an ongoing inquiry

into potential fraud by the disclosing party.

34.     In or about August 2012, HHS/OIG federal agents were investigating allegations

that one or more persons associated with Allegiance had violated federal criminal law related to

a federal health care program. In or after August 2012, the defendants became aware of the

investigation and attempted to circumvent the criminal investigation by submitting a Disclosure

Statement to HHS/OIG.

35.    It was further part of the conspiracy that on or about November 8, 2012, Kazim

Meo, on behalf of Allegiance, caused a Disclosure Statement to be submitted to HHS/OIG.  Also

submitted was Kazim Meo's affidavit, certifying that the information in the Disclosure Statement

was true.  Contrary to his certification, Kazim made a number of false statements, including the

following:

> Azeem Meo has provided some **indirect assistance** to [Allegiance] in connection
> with the fact that his son, Kazim Meo, is the sole owner of [Allegiance's] majority
> shareholder. Azeem Meo performed some administrative services on behalf of
> [Allegiance], such as informal accounting advice, technical support (e.g.,
> installing printers), contract negotiation, and marketing services . . .These
> consulting services ceased in approximately February 2012. (emphasis added)

36.    At the time Kazim Meo made the false statements in the Disclosure Statement, he

knew that Azeem Meo's involvement in Allegiance was much more than "indirect assistance."

Kazim Meo also knew Azeem Meo was still making management decisions and receiving funds

directly or indirectly from Allegiance as late as August 2012.

37.    In fact, on or about August 21, 2012, Azeem Meo sent an email to Camillo

concerning Allegiance business activities.  The lengthy email addressed, among other matters,

the expenses that Camillo was responsible for beginning on August 1, 2012 and the sale of vans

owned by Allegiance.  Azeem Meo further stated:  "Referral or marketing fee for all account

directly or indirectly introduced by you will be paid $5 per specimen . . . For the month of

August as of 8-20-12 there are 666 specimen net after, Dr. Vaid, Shah, Lab Pro is 327. . . . $327

x 5=$1,625 as 8-20-12 will adjust for month of August expenses."

### Illegal Kickbacks Paid to "Marketers"

38.    It was further part of the conspiracy that the defendants entered into contracts

among themselves and with other individuals and businesses and agreed to pay for each

specimen that was referred or sent to Allegiance for testing.  The contracts took the form of

11

contracts for marketing, consulting, specimen processing and handling, space and equipment rental, and medical director services. Some of these contracts and agreements are described below.

<u>Robert Sommerfeld</u>

39.     In an April 20, 2012 email, Camillo told Azeem Meo that he had had contact with individuals in Indiana and Chicago who were interested in receiving payments for referring or arranging for specimens to be sent to Allegiance. Camillo reported that Dr. R.M. in Indiana will "give us drug testing right away from his 5 clinics" . . . and "would like to [create] an entity for marketing his [colleagues] so that he can share in the profits for any that he markets." Camillo also stated that Bob Sommerfeld in Chicago could send hundreds of specimens to Allegiance and wanted $20.00 per specimen or 50% of the profit.

40.     As discussed in more detail later, in paragraphs 110 to 118 of this indictment, Sommerfeld reached an agreement with Camillo to receive payments for referring or arranging for specimens to be sent to Allegiance and later to AMS Medical Laboratory.

<u>S.H., LabTest</u>

41.     On or about April 8, 2011, Camillo signed a "Memo of Understanding" ("MOU") with S.H., an officer of Labtest, LLC. Per the MOU, Camillo offered to pay Labtest a "variable monthly fee," based on the total revenues generated by the specimens sent to Allegiance. On attached Schedule A of the MOU, Camillo and S.H. agreed that the profit sharing formula would be 50-50 and each signed the attached schedule. From April to August 2011, Allegiance paid LabTest over $18, 000. Camillo signed all the checks.

12

C.S., Beyond Medicine, LLC

42.     On or about June 22, 2012, Camillo signed a contract with C.S., doing business as Beyond Medicine, LLC, to provide marketing and customer services to Allegiance.  Per the agreement, C.S. was to provide laboratory specimens from various sources to Allegiance. Pursuant to this contract, Camillo offered and Allegiance paid Beyond Medicine $20 for each specimen that C.S. referred or arranged to be sent to Allegiance.  Further, C.S. and Camillo agreed that Allegiance would be the exclusive provider of certain laboratory tests.

43.     From in or about June 2012 to in or about October 2012, Allegiance paid Beyond Medicine over $20,000 for specimens that Beyond Medicine referred or sent to Allegiance.  The checks were signed by Camillo, Azeem Meo or Kazim Meo.

**Illegal Kickbacks Paid to Doctors**

44.     It was further part of the conspiracy that the defendants offered and paid doctors, directly or through their businesses, for the referrals that the doctors made to Allegiance.

45.     From in or about January 2010 to in or about April 2012, Dr. Golding solicited and received payments in return for sending laboratory specimens to Allegiance.  Some of the payments to Dr. Golding were made by checks signed by Camillo and Kazim Meo.  When Dr. Golding did not receive the promised or requested payments, he stopped sending specimens to Allegiance.

46.     It was further part of the conspiracy that the defendants paid un-indicted co-conspirator Dr. B.V. for each blood and urine specimen that he referred to Allegiance.

47.     In or after July 2012, defendants Camillo, Rehan Rana, Kazim Meo, and un-indicted co-conspirator Azeem Meo met and discussed, among other things, payments that they were making to doctors for referrals.  This conversation was recorded.

13

48.     During the recorded conversation, Camillo stated: "You'd still have to pay Dr. B." Camillo also stated: "Let's get away from paying on each specimen and let's just pay on specimens we actually get or that we collect on." He further stated: "[W]e still have commission to the guy who brought it [specimen] to us."

49.     It was further part of the conspiracy that the Allegiance staff tracked the number of specimens referred or sent to Allegiance. The defendants based the kickback payments on the volume of the specimens received and the value of the tests performed on the specimens.

## OVERT ACTS

50.     In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Missouri:

51.     In or after July 2012, defendants Camillo, Rehan Rana, Kazim Meo, and un-indicted co-conspirator Azeem Meo met and discussed payments that they were making to doctors and others for referring and sending specimens to Allegiance.

52.     On or about August 21, 2012, Azeem Meo sent an email to Camillo that discussed the division of Allegiance into two departments and other matters related to the operation of Allegiance. The email stated: "Per Rehan's instruction today and Per our conversation two weeks at Imran pharmacy . . . ."

53.     On or about September 4, 2012, Kazim Meo signed check, #1037, drawn on an Allegiance bank account at Regions Bank and payable to Beyond Medicine for specimens referred or sent to Allegiance.

54.     On or about September 18, 2012, Kazim Meo received a report prepared by D.M., the office manager of Allegiance, concerning un-indicted co-conspirator C.S. The report reflected the number of referrals made by C.S. during the previous period.

55.     On or about the dates indicated below, Azeem Meo wrote counter checks to himself on an Allegiance account at Regions Bank:

a.     August 7, 2012              $4200.00

b.     August 13, 2012            $2000.00

All in violation of Title 18, United States Code, Sections 371 and 2.

## COUNT 2
## FALSE STATEMENT TO FEDERAL AGENCY
## 18 U.S.C. §§ 1001 and 2

56.     Paragraphs 1-20, 24-37, 52, and 55 are incorporated by reference as if fully set out herein.

57.     On or about November 8, 2012, in the Eastern District of Missouri and elsewhere,

**KAZIM A. MEO,**

the defendant herein, did knowingly and willfully falsify, conceal, and cover up by trick, scheme, and device a material fact, made materially false, and fraudulent statements and representations, and made and used materially false writings and documents, in a matter within the jurisdiction of the United States Department of Health and Human Services, an agency of the government of the United States, that is, Kazim Meo caused a Disclosure Statement to be submitted that falsely stated that Azeem Meo, an excluded person, had only provided "indirect assistance" to Allegiance and further stated that Azeem Meo's involvement ceased in February 2012. At the time Kazim Meo made these statements, he knew that Azeem Meo continued to participate in the management of Allegiance until at least August 2012.

All in violation of Title 18 United States Code, Sections 1001 and 2.

15

## COUNTS 3-6
## HEALTH CARE FRAUD SCHEME
## 18 U.S.C. §§ 1347(a) and 2

58.     Paragraphs 1-20 and 24-49 are incorporated by reference as if fully set out herein.

59      It was part of the scheme and artifice to defraud that the defendants offered, solicited, paid, and received illegal kickbacks for referring and sending specimens to Allegiance for testing.

60.     It was further part of the scheme and artifice to defraud that the defendants concealed the illegal kickbacks by entering into sham contracts, while knowing that one of the purposes of the contracts and payments was to obtain specimens for testing by Allegiance.

61.     It was further part of the scheme and artifice to defraud that the defendants submitted or caused to be submitted reimbursement claims to Medicare and Medicaid for the tests performed on the specimens obtained by illegal kickbacks.  The defendants knew that compliance with the AKS was a condition of payment and that Medicare and Medicaid would not pay for services procured by illegal kickbacks.

62.     It was further part of the scheme and artifice to defraud that the defendants did not disclose to Medicare and Medicaid that Azeem Meo, an excluded provider, participated in, managed, and controlled Allegiance.

63.     It was further part of the scheme and artifice to defraud that the defendants took affirmative steps to conceal from Medicare Azeem Meo's participation in Allegiance.

64.     On or about the dates listed below, in the Eastern District of Missouri,

**ANTHONY B. CAMILLO,
DEVON N. GOLDING, M.D.,
REHAN RANA, and
KAZIM A. MEO,**

16

the defendants herein, knowingly and willfully executed and attempted to execute a scheme and

artifice to defraud a health care benefit program, in connection with the delivery and payment for

health care benefits, items, and services, that is, the defendants submitted reimbursement claims

to Medicare, a federal health care benefit program, for services provided by Allegiance, when the

defendants knew that Medicare would not pay for services obtained by illegal kickbacks and

performed by a laboratory managed and controlled by an excluded person.

| Count | Date of Claim | Patient | Doctor |
|-------|---------------|---------|--------|
| 3 | 8-29-12 | A.M. | H.R. |
| 4 | 8-30-12 | B.P. | B.V. |
| 5 | 9-4-12 | S.J. | B.T. |
| 6 | 9-11-12 | R.W. | Golding |

All in violation of Title 18, United States Code, Sections 1347(a) and 2.

### COUNT 7
### THE CONSPIRACY AND ITS OBJECTS
### 18 U.S.C. § 371 and 2

65.    Paragraphs 1-20 are incorporated by reference as if fully set out herein.

66.    From in or about 2012 to in or about 2016, in the Eastern District of Missouri and

elsewhere,

**ANTHONY B. CAMILLO,**
**REUBEN F. GOODWIN,**
**PHILLIP L. JONES,**
**DWIGHT McTIZIC,**
**NICOLE McTIZIC,**
**ROBERT J. SOMMERFELD, and**
**AMS MEDICAL LABORATORY, INC.,**

17

the defendants herein, and others known and unknown, willfully and knowingly did combine,

conspire, confederate, and agree together, and with each other, to defraud the United States and

to commit offenses against the United States, that is,

a.   to knowingly and willfully solicit, receive, offer and pay remuneration (including

any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash

and in kind in return for and to induce a person to refer, recommend, furnish, and

arrange for the furnishing, ordering, purchasing, and leasing of any item and

service, paid in whole and part under a federal health care program, in violation of

42 U.S.C. § 1320a-7b(b)(1);

b.   to knowingly and willfully execute and attempt to execute a scheme and artifice

to defraud a health care benefit program, in connection with the delivery and

payment for health care benefits, items, and services, in violation of 18 U.S.C. §

1347(a); and

c.   to knowingly and willfully falsify, conceal, and cover up by trick, scheme, and

device a material fact; to make materially false, fictitious, and fraudulent

statements, and representations; and make and use a materially false writing and

document knowing the same to contain a materially false, fictitious, and

fraudulent statement and entry, in connection with the delivery of and payment

for health care benefits, items, and services, in violation of 18 U.S.C. § 1035.

## PURPOSE OF THE CONSPIRACY

67.   The purpose of the conspiracy was for the defendants and other co-conspirators:

a.      to solicit, offer, pay and receive illegal kickbacks in return for referring,

recommending, and arranging for blood, urine, and other specimens to be sent to

AMS Laboratory;

b.      to receive reimbursement from Medicare and Medicaid for testing specimens that

were obtained as a result of illegal kickbacks and that were up-coded and non-

rendered; and

c.      to receive and distribute the proceeds of the conspiracy and to benefit financially

from the conspiracy.

### MANNER AND MEANS OF THE CONSPIRACY

68.      In or about October 2012, Amanda L. Meier opened AMS Medical Laboratory

("AMS") as a limited liability company.  Amanda Meier is Camillo's daughter.  In or about

March 2013, AMS changed its legal structure and name to AMS Medical Laboratory, Inc., but

its functions did not change.

69.      Since AMS's inception, Camillo has held various positions with AMS.  At

different times, Camillo has identified himself on documents as the owner, president, technical

consultant, technical director, or managing partner of AMS.

70.      In or about October 2012, Amanda Meier completed a Medicare provider

enrollment application for AMS.  As part of the application process, on or about October 1,

2012, Amanda Meier, as president of AMS, and Justin Camillo, as vice president of AMS,

signed the application and acknowledged that they had read the application, including Sections

14 and 15.  Justin Camillo is the son of Camillo.

71.      Section 14, entitled "Penalties For Falsifying Information," informed Amanda

Meier and Justin Camillo that they could be prosecuted under several federal statutes if they

19

knowingly and willfully executed or attempted to execute a health care fraud scheme; knowingly

and willfully falsified, concealed or covered up by any trick, scheme or device a material fact;

made any false, fictitious or fraudulent statements or representations; or made any false writing

or document related to a matter within the jurisdiction of a federal agency and department or

related to a federal health care benefit program

72.     Section 15, entitled "Certification Statement," required Amanda Meier and Justin

Camillo to acknowledge that they had read and understood the "Penalties for Falsifying

Information." They were also informed that:

> The Medicare laws, regulations, and program instructions are available through
> the Medicare contractor.  I understand that payment of a claim by Medicare is
> conditioned upon the claim and the underlying transaction complying with such
> laws, regulations, and program instructions (including, but not limited to the
> Federal anti-kickback statute and the Stark law) and the supplier's compliance
> with the applicable conditions of participation in Medicare.

73.     After the successful completion of the application process, AMS was assigned a

unique provider number, which is a necessary identifier for billing services to Medicare.

**Defendants' Use of Sham Service Contracts**

74.     It was part of the conspiracy that the defendants entered into sham contracts and

agreements that falsely characterized illegal kickbacks as payments for services provided to

AMS.  The contracts took several forms, including but not limited to contracts to provide

marketing, consulting, specimen processing and handling, space and equipment rental, customer

services, and courier service.

75.     Significantly, the payments that AMS made under these contracts were based on

the volume and value of the specimens referred or sent to AMS.  The more specimens referred or

sent and the higher the reimbursement that AMS received, the more AMS paid the source

referring or sending the specimens.

20

## Illegal Kickbacks to "Marketers"

76.     It was part of the conspiracy that Camillo agreed to pay a percentage - typically 50% - of AMS profits for each specimen referred or sent to AMS for testing.  The payments were far in excess of the fair market value for the services purportedly rendered to AMS.  In many instances, AMS paid these sources in excess of $150 per specimen.  Some of the offers by Camillo and contracts that Camillo signed are described below.

Phillip Jones and Reuben Goodwin, Southwest Disability Services

77.  .   At all times relevant to this indictment, Southwest Disability Services ("SWDS") was a non-profit agency, located in Chicago Heights, Illinois.  SWDS provided services to adults with developmental disabilities or alcohol abuse problems.  SWDS operated one developmental training site and several residential facilities and also provided community supervision and supportive services to its clients.

78.     At all times relevant to this indictment, defendant Reuben F. Goodwin was the executive director of SWDS.  Defendant Phillip L. Jones was an employee of SWDS.

79.     On or about May 8, 2014, Phillip Jones signed an agreement ("SWDS Agreement") with AMS, purportedly to provide "marketing, processing, reporting, customer services and courier service for AMS Medical Lab."  In reality, the SWDS Agreement was a way to conceal and disguise illegal payments that AMS made for referrals.

80.     In the SWDS Agreement, Camillo and AMS agreed to split AMS profits with Phillip Jones if he referred or sent specimens to AMS.  The agreement stated that Medicare and Indiana Medicaid paid AMS $602 and $602.92 respectively for certain urine tests.  AMS's costs for testing each specimen was $209.00.  According to the SWDS Agreement, Phillip Jones would receive $196.00 (50% of the profit) per specimen that he referred or sent to AMS.

21

81.     Shortly after the SWDS Agreement was signed, on May 2, 2014, Camillo sent an email to Phillip Jones, suggesting that Phillip Jones meet with Camillo's Chicago partner "Bob Sommerfeld." Camillo also stated that paying doctors "RENT" was one way to get the doctors' business. Camillo stated:

> I have equipment ready to go and we are waiting on a good location. we would like to place it some where that we could also get some physician or clinic business since we would RENT space. Renting gives us one and only one incentive to use on a practice or physician that may have space in exchange for some business. . . . I have a partner Bob Sommerfeld in Chicago . . . He will have much information on how the chicago market works, what we have in mind and ways he can assist you in marketing. He also has physicians, pschiatrists etc and can assist with ways to make treatment plans and note the records.

82.     It was further part of the conspiracy that the defendants collected specimens from individuals when they knew that no doctor or other qualified professional had ordered medical tests for these individuals. Because insurers would only reimburse for tests ordered by doctors, the defendants solicited and used doctors who would attach their names to the tests without examining or having any information about the patients.

83.     As reflected in emails between Camillo and Reuben Goodwin, the specimens were often collected at churches and public fairs. In an August 12, 2014 email, Reuben Goodwin told Camillo: "We have a very large fair in Indiana on Saturday we are expecting about 200 participants and have a phlebotomy crew. . . . If you need us to slow down please let me know because we have rather large fairs in Indiana booked for the next 3 months and Phil and I need to be able to manage the expenses."

84.     In an August 12, 2014 email, Camillo described the way he had calculated a payment made to Phillip Jones and Reuben Goodwin. Camillo stated: "monthly numbers including Dr. Thomas, as you see the total receipts are $12,900.95. Once we deduct costs of

$4180 that leaves us with $8720.45.  If I split profit with you at 50-50, Your check would be

$4360.48 . . . Please advise if you want $4360.48 deposited today."

85.     During 2014 and 2015, AMS and Camillo paid SWDS for the specimens Phillip

Jones referred or sent to AMS.  In a June 3, 2015 email to Reuben Goodwin, Camillo stated that

AMS had paid SWDS "around 105 K" for specimens referred in 2014.

Dwight and Nicole McTizic, True Care International Services, Inc.

86.     True Care International Services, Inc. was an Illinois corporation, operated at

times by defendants Dwight and Nicole McTizic.  True Care International Services, Inc. dba

True Care Durable, Inc. ("True Care") provided durable medical equipment and other services in

the Cook County Illinois area.

87.     In a July 29, 2013 email to Dwight McTizic, Camillo offered to pay True Care

50% of the profit for each specimen referred or sent to AMS by True Care.  For a Medicare

patient, Camillo calculated the profit per test was $355.00. Camillo told Dwight McTizic:

> If it is a deal between you, Bob [Sommerfeld], and I, AMS gets 177.50. You get
> 134.00 and Bob gets 47.50 for Medicare and nothing for Il. Medicaid. If you don't
> use Bob's services, then its just you and I and we each receive 177.50. If you
> bring on a third party, I suggest you give him or her $90.00 per Medicare and you
> and I each keep $132.50. You can't give any on Il. Medicaid due to poor
> reimbursement. . . . Let me know if you concur with the prices and I'll write it up
> in an agreement.

88.     On or about October 8, 2013, Amanda Meier wrote a check in the amount of

$4071.00 to Dwight McTizic.  The words "23 tests sent" appear on the memo line.  On or about

October 25, 2013, Camillo wrote a check in the amount of $477 to Dwight McTizic.

89.     Un-indicted co-conspirator D.C. is an employee of AMS.  On or about January 4,

2014, D.C. wrote a $9460 check payable to defendant Nicole McTizic.  The words "dec drug

testing" are on the memo line.

90.     On or about April 10, 2014, un-indicted co-conspirator D.C. wrote a check payable to Dwight McTizic for $3550. On the same day, D.C. wrote a check to Dwight McTizic for $3017.

91.     An email exchange between Camillo and Nicole McTizic demonstrates that they both knew that doctors were not ordering tests for patients. Rather, the defendants found simply doctors who would sign off on the orders, although the doctors had not seen the patients or received any information concerning the patients' conditions.

92.     On September 26, 2014, defendant Nicole McTizic contacted Camillo with "lab questions." Nicole McTizic asked: "Does AMS still have a physician on board who can sign off on patient requested medication compliance specimens? Please advise as there are several community events where representatives and nurses may come in contact with persons interested in receiving on the spot Medication Compliance Testing." Camillo responded: "Bob Sommerfed up in chicago can provide you with a doctor."

93.     On or about December 18, 2014, un-indicted co-conspirator D.C. wrote a $5400 check payable to Nicole McTizic. "36@150" appears on the memo line.

94.     On or about February 10, 2015, un-indicted co-conspirator D.C. wrote a $5100 check payable to Nicole McTizic. "34@150" appears on the memo line.

95.     On or about March 31, 2015, un-indicted co-conspirator D.C. wrote a $1100 check payable to Nicole McTizic. "7x150 2x25" appears on the memo line.

96.     On or about November 28, 2014, HHS/OIG excluded Dwight McTizic from participating for eight years in any capacity in Medicare and Medicaid Programs. Despite this exclusion, Dwight McTizic continued to participate in AMS and to receive payments from AMS in 2015.

97.     On or about May 21, 2015, un-indicted co-conspirator D.C. wrote a check for $11,520 to True Care.

98.     In a June 30, 2015 email to Dwight McTizic, Camillo stated: "Ok, I will cut check and deposit Wed. Morning for Medicare genetics and drug tests BUT I need a spread sheet of patients and dates of services for the medicaid, HMO, and insurance so we can track the patients and payments and we will pay based on those numbers separately. This is how Nicole and I did things when you were out."

99.     Between October 2013 and December 2015, Camillo and AMS paid Dwight and Nicole McTizic $114,690 for specimens that they referred or sent to AMS.

J.K., OrthoOptions, LLC

100.     Un-indicted co-conspirator J.K. is the founder/managing director of OrthoOptions, LLC, a Miami-based company. On or about February 2014, AMS entered into a contract with J.K., doing business as OrthoOptions, to purportedly provide "marketing, processing, reporting, customer service and courier service for AMS Medical Lab." The contract stated: "It is agreed AMS and [J.K.] will split profit of 355. Each party will receive $177 per specimen."

101.     In an email to J.K. dated February 12, 2014, Camillo stated that he was mailing a check for specimens referred or sent to AMS: "mailing check for $913.29 as follows . . . 1 patient @609.05 less expenses as follows . . . Profit=421 less 50% =$210 Ortho." Camillo further stated: "Reinforces what I tell you that medicare and medicaid as a rule pay more than private insurance."

102.     On or about March 12, 2014, un-indicted co-conspirator D.C. wrote a check to J.K. for $2000. The words "Ortho-marketing" are on the memo line.

D.J.C., MedStop One

103.    MedStop One is a medical clinic located in Cape Girardeau, Missouri. Un-
indicted co-conspirator D.J.C. is the organizer and the director of MedStop One. D.J.C. also
owned Cantrell Enterprises, a staffing company.

104.    Camillo and AMS entered into a number of contracts with D.J.C., MedStop One,
and Cantrell Enterprises through which the companies received payments in cash or in kind from
AMS for referring or sending specimens to AMS.

105.    On or about November 1, 2014, Camillo entered into a staffing agreement with
Cantrell Enterprises. Per the contract, Cantrell Enterprises was to provide an employee to AMS,
who would "provide such duties as they have been trained, educated, and prepared for." Cantrell
Enterprises would "submit monthly invoices for charges in connection with supplying contracted
employees." Notably, the staffing contract does not specify the duties of the employee, the
amount of time the employee is to devote to services for the benefit of AMS, or the
compensation for the services.

106.    On or about November 15, 2014, Camillo and D.J.C. signed another contract,
entitled "AMS Medical Laboratory LLC Process & Handling Agreement." This contract was
between AMS and MedStop One. The contract provided that MedStop One would be paid $20
per patient for specimens and an additional $40 for genetic swabs. The contract stated: "AMS
will pay MedStop for processing & handling by Physician, . . . AMS will pay Physician a
$20.00 per Patient fee" and $40 for each genetic swab. Further, the contract stated: "AMS shall
pay Physician appropriate process and handling fees on a monthly basis."

107.    In or about November 2014, Camillo and D.J.C. signed a lease for space at
MedStop One. The monthly lease payment was $2500 per month.

26

108.    On December 1, 2014, un-indicted co-conspirator D.J.C. responded to an earlier email from Camillo and told Camillo how the agreed-upon payments were to be made. Significantly, D.J C. stated that the "$2600 to MedStop One for 'Rent'" is really compensation for "Heather."  This email demonstrates that Camillo and D.J.C. knew that the payments for "Rent" were simply a means to pay illegal kickbacks to D.J.C. and his companies.

109.    Through these and other contracts, AMS paid D.J.C., his wife, and their companies $340,893.73 during the period from December 2014 to August 2016.

Robert Sommerfeld, Wellbeing Healthcare, Inc. and Direct Medical Access Services, Inc.

110.    Direct Medical Access Services, Inc. ("Direct Medical") is a Wisconsin corporation owned and operated by defendant Robert Sommerfeld ("Sommerfeld").  Wellbeing Healthcare, Inc. ("Wellbeing"), also owned by Robert Sommerfeld, is incorporated in Wisconsin and Illinois.

111.    In a May 9, 2012 email to Sommerfeld, Camillo indicated that he would pay much more than the cost of collecting the specimen:  "Yes we figure that it costs us average of 4-5 dollars to collect the specimen. . .  We agree to . . . reimburse you $20.60 per specimen."

112.    In the same email, Camillo told Sommerfeld how the doctor should sign and complete the patient charts to justify the testing:  "Have the physician sign the form I sent you yesterday, For the nursing home chart he can be more vague and say, 'Perform Monthly Drug tests with adulteration screening on all patients prescribed the following medications; Benzodiazepines, Amphetamines, Opiates, Oxycodone, Tricyclic antidepressants.'"

113.    Camillo also told Sommerfeld which patients to focus on to get the highest reimbursement:  "we would like you not to focus on high medicaide clients but rather focus on high medicare patients . . .".

114.     In a June 19, 2012 email, Camillo responded to an earlier email from Robert Sommerfeld concerning a proposed agreement between AMS and Direct Access. Camillo stated:

> Bob, this looks good to me. The only concern I have would be item 4 under our obligation. I don't want to nickel and dime you like other labs but we have extended very far in our commitment to give you $40.00 per specimen so the cost of the program must come out of that forty as well as the cost of the cup. We can extend it and cover it but will deduct from your monthly income after you invoice us, therefore you wont have to put any money out up front. Let me know your thoughts!

115.     On or about June 5, 2015, un-indicted co-conspirator D.C. wrote a check to Wellbeing for $20,000. The words "expenses x 2-2015" are on the memo line.

116.     On or about June 11, 2015, D.C. wrote a check to Wellbeing for $90,000.

117.     On or about June 19, 2015, D.C. wrote a check to Wellbeing for $10,000.

118.     From in or about January 2013 to in or about April 2016, AMS paid Wellbeing and Direct Medical Access $1,980,752.

Twinhill Group

119.     On or about March 5, 2014, Camillo signed a contract with Twinhill Group. The contract stated: "It is agreed that AMS and TWINHILL will split profit of 277.00. Each party will receive $138.50 per [Medicaid] specimen. . . . TWINHILL agrees to market blood and drugs spec to AMS exclusively."

Hassieannie@yahoo.com

120.     On or about September 16, 2013, Camillo sent an email to an individual named "Leslie." In the email, Camillo offered to split the profits on specimens. Camillo stated: "For you and your husband, The average reimbursement from Medicare per test is around $600.00.

What I do is deduct following costs: . . .**total costs $163.** 600-163=$437 PROFIT, I split this profit with you 50-50 or 215.50 each."

**OVERT ACTS**

121.    In furtherance of the conspiracy, and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Missouri:

122.    In or about August 2014, Phillip Jones and Reuben Goodwin met with Camillo and the owner of AMS's billing company in St. Louis.

123.    On or about July 28, 2015, un-indicted co-conspirator D.J.C. met with Camillo in St. Louis.  AMS paid $933.60 for D.J.C.'s two-day stay at a hotel in downtown St. Louis.

All in violation of Title 18, United States Code, Sections 371 and 2.

**COUNTS 8-13**
**ILLEGAL KICKBACKS FOR REFERRALS TO AMS**
**42 U.S.C. §§ 1320a-7b(b)(2)(B) and 2**

124.    Paragraphs 1-20 and 74-120 are incorporated by reference as if fully set out herein.

125.    On or about the dates indicated below, in the Eastern District of Missouri,

**ANTHONY B. CAMILLO**
**and**
**AMS MEDICAL LABORATORY, INC.,**

the defendants herein, did knowingly and willfully pay remuneration, (including a kickback, bribe, and rebate), directly and indirectly, covertly and overtly, in cash and in kind, to the persons listed below to induce such persons to purchase, lease, order, and arrange for and recommend the purchasing, leasing, and ordering of a good and service, for which payment may be made in whole or in part under a Federal health care program, that is, Anthony Camillo and

29

AMS Medical Laboratory paid a share of AMS's profits for each specimen that the persons listed below referred, recommended, or arranged to be sent to AMS for testing.

| Count | Date | Payee | Payment |
|-------|------|-------|---------|
| 8 | 2-4-15 | MedStop | $5400 |
| 9 | 2-4-15 | Cantrell Enterprises | $2600 |
| 10 | 7-8-15 | Medstop One | $9680 |
| 11 | 8-3-15 | MedStop One | $5680 |
| 12 | 8-31-15 | MedStop One | $2500 |
| 13 | 9-3-15 | MedStop One | $5680 |

All In violation of Title 42, United States Code, Sections 1320a-7b(b)(2)(B) and 2.

## COUNTS 14-24
## HEALTH CARE FRAUD SCHEME
## 18 U.S.C. §§ 1347(a)(2) and 2

126.     Paragraphs 1-20 and 74-120 are incorporated by reference as if fully set out herein.

127.     It was part of the scheme and artifice to defraud that the defendants offered, solicited, paid, and received illegal kickbacks for referring and sending specimens to AMS for testing.

128.     It was part of the scheme and artifice to defraud that the defendants concealed the illegal kickbacks by entering into sham contracts, while knowing that one of the purposes of the contracts and payments was to obtain specimens for testing at AMS.

129.     It was further part of the scheme and artifice to defraud that the defendants submitted and caused to be submitted reimbursement claims to Medicare for the tests performed on the specimens procured by illegal kickbacks.  The defendants knew that compliance with the

AKS was a condition of payment and that Medicare and Medicaid would not pay for services procured by illegal kickbacks.

     130.   On or about the dates indicated below, in the Eastern District of Missouri,

**ANTHONY B. CAMILLO,**
**REUBEN F. GOODWIN,**
**PHILLIP L. JONES,**
**DWIGHT McTIZIC,**
**NICOLE McTIZIC,**
**ROBERT J. SOMMERFELD, and**
**AMS MEDICAL LABORATORY, INC.,**

the defendants herein, knowingly and willfully executed and attempted to execute, the above described scheme and artifice to defraud health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendants submitted to Medicare, a federal health care benefit program, reimbursement claims for services provided by AMS, when the defendants knew they had obtained specimens in return for illegal kickbacks and also knew that Medicare would not pay for services obtained by illegal kickbacks.

| Count | Date of Claim | Patient | Doctor | Referring Source |
|---|---|---|---|---|
| 14 | 4-28-15 | R.P. | I.D. | True Care/McTizic |
| 15 | 5-19-15 | L.T. | I.D. | True Care/McTizic |
| 16 | 5-7-15 | N.J. | I.D. | True Care/McTizic |
| 17 | 2-12-15 | M.T. | H.K. | Phillip Jones |
| 18 | 3-17-15 | M.H. | H.K. | Phillip Jones |
| 19 | 9-18-14 | J.A. | B.T. | Phillip Jones |
| 20 | 10-30-14 | V.M. | B.T. | Phillip Jones |
| 21 | 3-25-15 | P.J. | K.T.C. | Wellbeing/Sommerfeld |
| 22 | 3-31-15 | W.A. | J.C. | Wellbeing/Sommerfeld |

31

| 23 | 4-2-15 | A.C. | F.R. | Wellbeing/Sommerfeld |
| 24 | 4-16-15 | G.H. | K.T.C. | Wellbeing/Sommerfeld |

All in violation of Title 18, United States Code, Sections 1347(a)(1) and 2.

## COUNTS 25-27
### HEALTH CARE FRAUD SCHEME
### 18 U.S.C. §§ 1347(a)(2) and 2

131.    Paragraphs 1-20 are incorporated by reference as if fully set out herein.

132.    At all times relevant to this indictment, Western Slope Laboratory, LLC,

("Western Slope") was a Michigan limited liability company with offices in Michigan.

133.    In 2013, the owner of Western Slope, Thomas McCormick ("McCormick"),

entered into an exclusion agreement with the United States Department of Health and Human

Services.  The exclusion agreement was the result of an investigation by HHS/OIG, which found

that McCormick knowingly submitted or caused to be submitted false and fraudulent claims for

urine drug tests.  This was McCormick's second exclusion; the first exclusion period began in

September 2001.  As a result of his exclusion, McCormick, and any company he managed and

controlled, such as Western Slope, was excluded from participating in any federal health care

benefit program.

134.    An excluded person or entity may not receive payment directly or indirectly from

any federal health care program for any items or services ordered or furnished by the excluded

person or entity.  This exclusion applies regardless of who submits the claim or other request for

payment.  Therefore, Camillo and AMS could not bill Medicare and Medicaid for the tests

performed by Western Slope and then pay Western Slope with the funds obtained from Medicare

and Medicaid.

32

135.    In a December 26, 2012 email to Camillo, McCormick stated: "A continuation
of strict adherence to the contractual provisions prohibiting the sending and testing of urine or
saliva samples from government-sponsored healthcare program participants is mandatory."

136.    In 2013, Camillo and AMS entered into a contract with Western Slope to perform
quantitative drug screens for AMS. Thereby, McCormick forcefully told Camillo that AMS
should not send specimens from Medicare and Medicaid patients to Western Slope. AMS
expressly agreed in its contract with Western Slope that "no samples provided by individuals
covered by government health care plans will be sent to WSL, or tested."

137.    In a March 20, 2013 email to McCormick, Camillo discussed the decision by a
Chicago laboratory to stop sending specimens, through AMS, to Western Slope. Camillo stated:
"primarily the problem was with the recent story floated around about your indictment and
settlement with OIG." Camillo also stated that the problem had been solved because the
documents "no longer read Wester Slope." In other words, Camillo told McCormick that he had
devised a way to conceal the fact that Western Slope was performing the tests.

138.    It was further part of the scheme and artifice to defraud that Camillo and AMS
sent urine specimens collected from Medicare and Medicaid patients to Western Slope.
Thereafter, Camillo and AMS knowingly submitted reimbursement claims to Medicare and
Medicaid for the tests conducted by Western Slope.

139.    It was further part of the scheme and artifice to defraud that Camillo and AMS did
not disclose to Medicare and Medicaid that Western Slope, owned by an excluded provider, had
performed the tests for which AMS sought and received reimbursement.

140.   It was further part of the scheme and artifice to defraud that Camillo and AMS took affirmative steps to conceal from Medicare and Medicaid that Western Slope had performed the tests.

### Execution of the Health Care Fraud Scheme

141.   On or about the dates indicated below, in the Eastern District of Missouri,

**ANTHONY CAMILLO**
**and**
**AMS MEDICAL LABORATORY, INC.,**

the defendants herein, knowingly and willfully executed and attempted to execute, the above described scheme and artifice to defraud health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendants submitted reimbursement claims to Medicare, a health care benefit program, which claims did not disclose that the laboratory tests had been performed by Western Slope, which was owned by an excluded provider.

| Count | Date of Claim | Patient | Doctor |
|-------|---------------|---------|--------|
| 25 | 1-31-14 | A.F. | J.M. |
| 26 | 9-4-14 | B.H. | B.T. |
| 27 | 8-1-14 | G.M. | M.C. |

All in violation of Title 18, United States Code, Sections 1347(a)(1) and 2.

### COUNTS 28-31
### HEALTH CARE FRAUD SCHEME
### 18 U.S.C. §§ 1347(a)(2) and 2

142.   Paragraphs 1-20 and 132-140 are incorporated by reference as if fully set out herein.

34

143.    A reference laboratory is one that actually performs the test on a specimen received from another laboratory, called the referring laboratory. As a general rule, a referring laboratory may not bill Medicaid for tests performed by the reference laboratory. There are a few exceptions to this general rule, but the exceptions do not apply to medical laboratories like AMS.

144.    Regulations of the Missouri Department of Social Services (DSS), which administers the Missouri Medicaid Program, provide that the submission of a claim for services not personally performed by the provider submitting the claim constitutes a "fraudulent billing practice."

145.    The Illinois Handbook for Laboratory Services provides that "[a] provider may only charge for services he or she personally provides. Providers may not charge for services provided by another person, even though one may be in the employ of the other." Additionally, the Illinois Administrative Code states that providers must certify that "[t]hey have personally rendered the services and provided the items for which charges are being made."

146.    Medicare permits a referring laboratory to bill for tests performed by a reference laboratory if the referring laboratory meets one of three conditions. AMS, as the referring laboratory, meets none of these conditions. First, AMS is not located in or a part of a rural hospital. Secondly, AMS is not wholly owned by Western Slope or any other reference laboratory used by AMS; nor does a third entity own both AMS and the reference laboratories used by AMS. Lastly, Medicare only permits billing by a referring laboratory if no more than 30% of its tests are sent to reference laboratories.

147.    In or about December 2013, relying on a legal opinion, the president of Express Medical Billing, AMS's billing company, told Camillo that AMS could not bill Medicaid for

35

tests performed by a reference laboratory. Missouri Medicaid also advised Camillo that AMS could not bill for reference laboratory tests.

148.     Nonetheless, from November 2013 to June 2014, Camillo and AMS submitted claims to Medicaid for tests performed by Western Slope, a reference laboratory managed and controlled by an excluded provider.

## Execution of the Health Care Fraud Scheme

149.     On or about the dates indicated below, in the Eastern District of Missouri,

## ANTHONY CAMILLO
## and
## AMS MEDICAL LABORATORY, INC.,

the defendants herein, knowingly and willfully executed and attempted to execute, the above described scheme and artifice to defraud health care benefit programs, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendants submitted reimbursement claims to Medicare and Medicaid, health care benefit programs, which claims falsely represented that AMS performed the laboratory tests, when in fact, the defendant knew that Western Slope conducted the tests.

| Count | Date of Claim | Patient | Doctor |
|-------|---------------|---------|--------|
| 28 | 5-14-14 | C.R. | A.L. |
| 29 | 5-14-14 | T.V. | B.T. |
| 30 | 6-2-14 | O.K. | B.T. |
| 31 | 4-1-14 | V.W. | S.S. |

All in violation of Title 18, United States Code, Sections 1347(a)(1) and 2.

## FORFEITURE ALLEGATIONS

The Grand Jury further finds by probable cause that:

36

1.      Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of an offense in violation of Title 18, United States Code, Section 1347 as set forth in Counts 3-6, 14-31, the defendants shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from gross proceeds traceable to the commission of the offense.

2.      Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

3.      If any of the property described above, as a result of any act or omission of the defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL

_____

FOREPERSON

CARRIE COSTANTIN
Acting United States Attorney

_____

DOROTHY L. McMURTRY, #37727
Assistant United States Attorney

37